UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

09 CV 7983

---

ROBERT J. CASEY and WILLIAM A. HOUSTON, Derivatively on Behalf of PFIZER INC.,

     Plaintiffs,

  vs.

DENNIS A. AUSIELLO, MICHAEL S. BROWN, M. ANTHONY BURNS, ROBERT N. BURT, W. DON CORNWELL, WILLIAM H. GRAY III, CONSTANCE J. HORNER, JAMES M. KILTS, JEFFREY B. KINDLER, GEORGE A. LORCH, DANA G. MEAD, SUZANNE NORA JOHNSON, STEPHEN W. SANGER, WILLIAM C. STEERE, JR., FREDA C. LEWIS-HALL, FRANK D'AMELIO and IAN READ,

     Defendants,

  – and –

PFIZER INC., a Delaware corporation,

     Nominal Defendant.

---

: Civil Action No.

: VERIFIED SHAREHOLDERS DERIVATIVE COMPLAINT

DEMAND FOR JURY TRIAL

## NATURE OF THE ACTION

1.      Plaintiffs Robert J. Casey and William A. Houston, by and through their undersigned attorneys, hereby submit this Verified Shareholder Derivative Complaint for the benefit of nominal defendant Pfizer Inc. ("Pfizer" or the "Company"), against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' violations of federal and state laws from the early 2000s to the present (the "Relevant Period").

2.      This is a shareholders derivative suit to recover damages for the Company arising from false and/or misleading records, statements and claims made, or caused to be made, by defendants on behalf of Pfizer.

3.      As alleged herein, defendants caused Pfizer to make thousands of false claims on federal and state health care programs in violation of federal and state laws.  For example, defendants systematically and improperly promoted a prescription drug – Bextra – for unapproved, off-label uses.  In addition, defendants gave substantial and illegal financial inducements to providers to encourage them to prescribe Bextra and/or to switch from competitor products.  These false claims cheated federal and state governments out of funds that should not have been paid, unlawfully enriched defendants, and subjected patients to non-approved, non-effective, and unsafe uses and dosages of Bextra.

4.      As a result of defendants' actions, Pfizer planned and executed schemes to illegally market drugs. As John Kopchinski, a former Company sales representative whose "whistle-blower" complaint helped prompt the government's actions said: "The whole culture of Pfizer is driven by sales, and if you didn't sell drugs illegally, you were not seen as a team player."

5.      These lawsuits and charges eventually resulted in Pfizer paying a record $2.3 billion in civil and criminal fines and penalties to resolve, as disclosed on September 2, 2009.  Not only was

- 1 -

this the largest health care fraud settlement and largest criminal fine of any kind ever, it was the

fourth Pfizer settlement concerning illegal marketing activities since 2002.

     6.     Indeed, as stated by acting U.S. attorney Michael Loucks: "Among the factors we

considered in calibrating this severe punishment was Pfizer's recidivism." Mr. Loucks added:

> The size and seriousness of this resolution, including the huge criminal fine of $1.3 billion, reflect the seriousness and scope of Pfizer's crimes. Pfizer violated the law over an extensive time period. Furthermore, at the very same time Pfizer was in our office negotiating and resolving the allegations of criminal conduct by its then newly acquired subsidiary, Warner-Lambert, Pfizer was itself in its other operations violating those very same laws. Today's enormous fine demonstrates that such blatant and continued disregard of the law will not be tolerated.

     7.     Further, defendants' actions resulted in one of Pfizer's subsidiaries – Pharmacia &

Upjohn, Inc. ("Pharmacia") – pleading guilty to one criminal count of felony misbranding under 21

U.S.C. §§331(a), 333(a)(2) and 352 of Bextra.

     8.     Importantly, as a result of the $2.3 billion settlement, it became apparent that

defendants' actions, specifically with respect to the Company's marketing of drugs for off-label uses,

extended beyond the drug Bextra and included the following drugs as well: Geodon, Zyvox and

Lyrica.

     9.     Accordingly, Pfizer's business, reputation and goodwill have been severely injured

and damaged.

## JURISDICTION AND VENUE

     10.     The claims asserted herein arise under §14(a) of the Securities Exchange Act of 1934

(the "Exchange Act"), 15 U.S.C. §78n(a), and Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated

thereunder, and under Delaware law for breach of fiduciary duty, abuse of control, corporate waste,

unjust enrichment and gross mismanagement. In connection with the acts, conduct and other wrongs

complained of herein, defendants, directly or indirectly, used the means and instrumentalities of

interstate commerce, the United States mail and the facilities of a national securities market.

11.    This Court has subject matter jurisdiction under §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331.

12.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

13.    Venue is proper in this Court under 28 U.S.C. §1391(a) because: (i) Pfizer maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Pfizer occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

14.    Plaintiff Robert J. Casey is a shareholder of Pfizer. He first acquired his Pfizer shares prior to January 2000.

15.    Plaintiff William A. Houston is a shareholder of Pfizer. He first acquired his Pfizer shares in 2005.

16.    Nominal defendant Pfizer is a Delaware corporation headquartered in New York, New York. According to its public filings, Pfizer "engages in the discovery, development, manufacture, and marketing of prescription medicines for humans and animals worldwide."

17.    Defendant Dennis A. Ausiello ("Ausiello") has been a Director of Pfizer since 2006. In addition, defendant Ausiello has served as a member of the Board's Audit Committee (the "Audit

- 3 -

Committee") during the Relevant Period. Further, defendant Ausiello served as a member of the Board's Corporate Governance Committee (the "Corporate Governance Committee") during the Relevant Period.

18.    Defendant Michael S. Brown ("Brown") has been a Director of Pfizer since 1996. In addition, defendant Brown served as a member of the Corporate Governance Committee during the Relevant Period.

19.    Defendant M. Anthony Burns ("Burns") has been a Director of Pfizer since 1988. In addition, defendant Burns has served as a member of both the Corporate Governance Committee and the Audit Committee during the Relevant Period.

20.    Defendant Robert N. Burt ("Burt") has been a Director of Pfizer since 2000. In addition, during the Relevant Period, defendant Burt served as a member of the Audit Committee.

21.    Defendant W. Don Cornwell ("Cornwell") has been a Director of Pfizer since 1997. In addition, defendant Cornwell has served as a member of the Audit Committee during the Relevant Period.

22.    Defendant William H. Gray III ("Gray") has been a Director of Pfizer since 2000. In addition, defendant Gray served as a member of the Corporate Governance Committee during the Relevant Period.

23.    Defendant Constance J. Horner ("Horner") has been a Director of Pfizer since 1993. In addition, defendant Horner served as a member of the Corporate Governance Committee during the Relevant Period.

24.    Defendant James M. Kilts ("Kilts") has been a Director of Pfizer since September 2007.

- 4 -

25.     Defendant Jeffrey B. Kindler ("Kindler") has been the Chief Executive Officer ("CEO") of Pfizer since July 2006. In addition, defendant Kindler has served as a Director of Pfizer since July 2006 and as Chairman of the Board since December 2006. Before becoming CEO of the Company, defendant Kindler served as Vice Chairman and General Counsel from March 2005 to July 30, 2006, Executive Vice President and General Counsel from April 2004 to March 2005, and Senior Vice President and General Counsel from January 2002 to April 2004.

26.     Defendant George A. Lorch ("Lorch") has been a Director of Pfizer since 2000.

27.     Defendant Dana G. Mead ("Mead") has been a Director of Pfizer since 1998.

28.     Defendant Suzanne Nora Johnson ("Johnson") has been a Director of Pfizer since September 2007. In addition, defendant Johnson has served as a member of the Audit Committee during the Relevant Period.

29.     Defendant Stephen W. Sanger ("Sanger") has been a Director of Pfizer since February 2009.

30.     Defendant William C. Steere, Jr. ("Steere") has served as a director of the Company since 1987. In addition defendant Steere has served as Chairman Emeritus of Pfizer since July 2001. Further, defendant Steere previously served as Chairman of the Board from 1992 to April 2001 and CEO from 1991 to 2000.

31.     Defendant Freda C. Lewis-Hall ("Lewis-Hall") has been the Chief Medical Officer of Pfizer during the Relevant Period.

32.     Defendant Frank D'Amelio ("D'Amelio") has been the Chief Financial Officer ("CFO") of Pfizer during the Relevant Period.

33.     Defendant Ian Read ("Read") has served as the Senior Vice President and President, Worldwide Pharmaceutical Operations of Pfizer during the Relevant Period.

- 5 -

## DEFENDANTS' DUTIES

34.     By reason of their positions as officers, directors, and/or fiduciaries of Pfizer and because of their ability to control the business and corporate affairs of Pfizer, defendants owed Pfizer and its shareholders fiduciary obligations of good faith, loyalty and candor, and were and are required to use their utmost ability to control and manage Pfizer in a fair, just, honest and equitable manner. Defendants were and are required to act in furtherance of the best interests of Pfizer and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Pfizer and its shareholders the fiduciary duty to exercise good faith and loyalty in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

35.     Defendants, because of their positions of control and authority as directors and/or officers of Pfizer, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial and directorial positions with Pfizer, each of the defendants had knowledge of material non-public information regarding the Company.

36.     To discharge their duties, the officers and directors of Pfizer were required to exercise candor, good faith, and loyalty in and control of the Company. By virtue of such duties, the officers and directors of Pfizer were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner, and complied with all applicable federal and state laws, rules,

- 6 -

regulations, and requirements and all contractual obligations, including acting only within the scope of its legal authority; and

(c)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

37.     Further, every member of the Board is obligated to comply with the Company's Code of Business Conduct and Ethics for Members of the Board of Directors, which provides, *inter alia*, that:

(a)     Directors must comply, and oversee compliance by employees, officers and other directors, with laws, rules and regulations applicable to the Company"; and

(b)     Directors must deal fairly, and must oversee fair dealing by employees and officers, with the Company's customers, suppliers, competitors and employees."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company**

38.     Pfizer was founded in 1849 as Charles Pfizer and Company, a chemicals business. Over the last century, it has aligned itself with the developing trends to become a research-based pharmaceutical company. On April 16, 2003, Pfizer acquired Pharmacia and combined operations to create the world's largest pharmaceutical company. The newly formed company, operating under the Pfizer name, is the world's third-largest company in market capitalization.

**History of Bextra**

39.     Bextra is Pfizer's trade name for the drug valdecoxib. Bextra/valdecoxib is a so-called "COX-2 Inhibitor." The "COX-2" class of drugs includes the previously released drug Celebrex, which is also marketed by Pfizer, and the competing drug Vioxx, manufactured by Merck. The COX-2 class of drugs is designed to relieve various forms of pain and inflammation.

40.    In November 2001, Bextra was first approved by the U.S. Food and Drug Administration ("FDA") for relief of the symptoms of osteoarthritis and adult rheumatoid arthritis, and for treatment of primary dysmenorrhea. Significantly, Pfizer had also sought approval for several additional indications, including acute pain, pre-operative dosing and opiod sparing, but was rejected by the FDA.

41.    Since Bextra's FDA approval, Pfizer has sought to expand its approved indication only once.

42.    Bextra's narrow FDA-approved indication limits the potential sales growth of the drug, particularly in view of the fact that numerous other approved pain medications are also available to the public.

43.    As alleged below, to grow drug sales in a constrained environment, defendants resorted to marketing strategies prohibited by federal law, including kickback schemes and off-label promotion. Defendants also circumvented federally mandated FDA approval processes by aggressively marketing Bextra for numerous unapproved uses, including, but not limited to: (i) treatment for general acute pain; (ii) chronic arthritis at doses greater than 10 mg/day; (iii) pre-surgical dosing; and (iv) post-surgical pain, among many others. Indeed, Pfizer's requests for approval for treatment for acute pain other than dysmenorrhea; chronic arthritis at doses greater than 10 mg/day; and dysmenorrhea at doses greater than two 20 mg doses/day, were specifically rejected by the FDA.

44.    In addition, defendants have caused the Company to violate federal anti-kickback laws by paying and offering to pay financial inducements to physicians and other providers to influence their Bextra prescribing practices.

## APPLICABLE LAWS AND REGULATIONS
## GOVERNING PFIZER'S OPERATIONS

**Prescription Drug Reimbursement Under**
**Medicaid and Other Federal Health Care Programs**

45.    Medicaid is a public assistance program providing for payment of medical expenses for the poor and disabled. Funding for Medicaid is shared between the federal government and state governments. The Medicaid program subsidizes the purchase of more prescription drugs than any other program in the United States.

46.    Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines. The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation. 42 U.S.C. §1396 *et seq*.

47.    Federal reimbursement for prescription drugs under the Medicaid program is available for "covered outpatient drugs." 42 U.S.C. §§1396b(i)(10), 1396r-8(k)(2), (3). Covered outpatient drugs are drugs that are used for "a medically accepted indication." 42 U.S.C. §1396r-8(k)(3).

48.    A medically accepted indication, in turn, is a use which is listed in the labeling approved by the FDA, or that is included in one of the drug compendia identified in the Medicaid statute. 42 U.S.C. §1396r-8(k)(6).

49.    During the Relevant Period, the off-label uses of Bextra promoted by defendants generally were not eligible for reimbursement from Medicaid because the drug's off-label uses were neither listed in the labeling approved by the FDA nor included in the drug compendia specified by the Medicaid statute.

**FDA Prohibition on Promotion of Off-Label Indications**

50.     Under the Food, Drug, and Cosmetics Act ("FDCA"), 21 U.S.C. §301 *et seq.*, new pharmaceutical drugs cannot be marketed in the United States unless the sponsor of the drug demonstrates to the satisfaction of the FDA that the drug is safe and effective for each of its intended uses. 21 U.S.C. §355(a), (d). Approval of the drug by the FDA is the final stage of a multi-year process of study and testing.

51.     The FDA does not approve a drug for treatment of sickness in general. Instead, a drug is approved for treatment of a specific condition, for which the drug has been tested in patients. The specific approved use is called the "indication" for which the drug may be prescribed. The FDA will specify particular dosages determined to be safe and effective for each indication.

52.     The indications and dosages approved by the FDA are set forth in the drug's labeling, the content of which must also be reviewed and approved by the FDA. 21 U.S.C. §§352, 355(d). An example of the drug's labeling is the printed insert in the drug's packaging. The FDA will only approve the new drug application if the labeling conforms to the uses and dosages that the FDA has approved. 21 U.S.C. §355(d).

53.     Under the Food and Drug Administration and Modernization Act of 1997 ("FDAMA"), if a manufacturer wishes to market or promote an approved drug for alternative uses, *i.e.*, uses not listed on the approved label, the manufacturer must resubmit the drug for another series of clinical trials similar to those for the initial approval. 21 U.S.C. §360aaa(b), (c). Until subsequent approval of the new use has been granted, the unapproved use is considered to be "off-label."

54.     "Off-label" refers to the use of an approved drug for any purpose, or in any manner, other than what is described in the drug's labeling. Off-label use includes treating a condition not indicated on the label, treating the indicated condition at a different dose or frequency than specified on the label, or treating a different patient population.

- 10 -

55.     The FDA is responsible for ensuring that a drug is safe and effective for the specific approved indication. However, the FDA does not regulate the practice of medicine. Once a drug is approved for a particular use, the FDA does not prohibit doctors from prescribing the drug for uses that are different than those approved by the FDA.

56.     Although physicians may prescribe drugs for off-label usage, the law prohibits drug manufacturers from marketing or promoting a drug for a use that the FDA has not approved. Specifically, under the Food and Drug laws, a manufacturer may not introduce a drug into interstate commerce with an intent that it be used for an off-label purpose. Further, a manufacturer illegally "misbrands" a drug if the drug's labeling (which includes all marketing and promotional materials relating to the drug) describes intended uses for the drug that have not been approved by the FDA. 21 U.S.C. §§331, 352.

57.     An off-label use of a drug can cease to be off-label only if the manufacturer submits a supplemental application and demonstrates to the satisfaction of the FDA that the product is safe and effective for the proposed new use. 21 U.S.C. §360aaa(b), ( c).

58.     In sum, the FDCA prohibits drug companies from promoting approved drugs for unapproved uses or from making misleading claims as to the drug's safety or effectiveness. *See* 21 U.S.C. §§331, 352, 355(d). This off-label regulatory scheme protects patients and consumers by ensuring that drug companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific governmental body, the FDA.

59.     Throughout the Relevant Period, defendants caused the Company to improperly market numerous of its drugs, including Bextra, Geodon, Zyvox and Lyrica, for numerous off-label uses.

- 11 -

**The Anti-Kickback Statute**

60.      The federal health care Anti-Kickback statute, 42 U.S.C. §1320a-7b(b), arose out of congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

61.      The Anti-Kickback statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally funded health care program. 42 U.S.C. §1320a-7b(b).

62.      Under this statute, drug companies may not offer or pay any remuneration, in cash or kind, directly or indirectly, to induce physicians or others to order or recommend drugs that may be paid for by a federal health care program. The law not only prohibits outright bribes and rebate schemes, but also prohibits any payment by a drug company that has as one of its purposes inducement of a physician to write additional prescriptions for the company's pharmaceutical products.

63.      Violation of the Anti-Kickback statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. §§1320a-7(b)(7), 1320a-7a(a)(7).

## THE TRUTH EMERGES IN SEPTEMBER 2009

64.      Instead of ensuring that the Company abided by the above-discussed laws and regulations, as defendants are required to do, defendants instead caused Pfizer to engage in

numerous violations of federal and state laws, which severely damaged the Company, causing it to be responsible for payment of record fines.

65.    The result of defendants' actions were revealed on September 2, 2009. In an article entitled "Pfizer In $2.3B Drug-Marketing Case Settlement," *Dow Jones International News* revealed that the Company had been engaged in multiple violations of the above-cited laws (and/or substantially similar other federal and state laws and regulations) and eventually paid $2.3 billion in civil and criminal penalties and fines. Specifically, the article stated:

> Pfizer Inc. has agreed to pay $2.3 billion to settle criminal and civil charges that it illegally marketed the pain drug Bextra and three other medicines for uses that weren't approved by the Food and Drug Administration, the U.S. Justice Department announced Wednesday.
>
> The agreement, the largest health-care fraud settlement in the department's history, calls for Pfizer to pay $1.3 billion in criminal fines and forfeitures and another $1 billion in civil fines. As part of the settlement, Pfizer subsidiary Pharmacia & Upjohn Co. will plead guilty to a felony violation in connection with the improper promotion of Bextra.
>
> Pfizer also will enter into a monitoring agreement that government officials described as unprecedented. The company will have to create a mechanism doctors can use to report questionable conduct by Pfizer sales representatives, and it must post information online about its payments and gifts to doctors.
>
> Any violations of the agreement could lead to additional fines and possible exclusion from participating in government health-care programs.
>
> Along with Bextra, authorities alleged Pfizer improperly promoted anti-psychotic drug Geodon, antibiotic drug Zyvox and epilepsy drug Lyrica.
>
> Authorities also said the drug maker paid kickbacks – including entertainment, cash, travel and meals – to doctors who prescribed those four drugs and nine other Pfizer offerings, including cholesterol drug Lipitor and impotence drug Viagra.
>
> Department lawyers said the penalties were steep because Pfizer is a repeat offender, with four Justice Department settlements this decade.
>
> "One of the factors we considered in calibrating this severe punishment is Pfizer's recidivism," said Michael Loucks, the U.S. attorney in Massachusetts.

\*       \*       \*

Pfizer pulled Bextra from the market in 2005 because the FDA concluded its risks, including a rare but serious skin reaction, outweighed its benefit.

The Justice Department said Pfizer promoted Bextra for several uses and dosages that the FDA specifically declined to approve because of safety concerns.

The FDA approved Bextra in 2001 to treat arthritis and menstrual pain. But the Justice Department said Pfizer also marketed the drug to treat acute pain and surgical pain – at dosages above the maximum levels approved by the FDA.

Government officials said Pfizer made false and misleading claims about the drug's safety, and pushed the drug on doctors for unapproved uses.

Officials said Pfizer's allegedly fraudulent marketing caused false claims to be submitted to government health-care programs such as Medicaid and Medicare, which paid for unapproved uses of Bextra and other drugs.

The government's investigation was spurred by several whistle-blower complaints alleging misconduct by Pfizer. As part of the settlement, six whistle-blowers – five Pfizer employees and a doctor in Pennsylvania – will receive payments totaling $102 million.

Pfizer said it expressly denies all of the government's civil allegations, except it acknowledged "certain improper actions" related to the promotion of Zyvox.

The company also said Wednesday it will pay $33 million to 42 states and the District of Columbia to settle state civil consumer protection allegations related to its past promotional practices concerning Geodon. A charge in that amount will be recorded this quarter.

66.    In connection with the settlement, the U.S. Department of Health & Human Services and U.S. Department of Justice constructed a website located at http://www.stopmedicarefraud.gov/ pfizerfactsheet.html (the "DOJ Website"), which specifically laid out the Company's violations and repercussions. In connection with defendants' "off-label" uses for the various drugs, the DOJ Website provides as follows:

**Bextra**

| FDA Approved Indications | Off-Label Uses Promoted |
| --- | --- |
| – Osteoarthritis | – Acute pain |
| – Adult rheumatoid arthritis | – Various types of surgical pain |
| – Primary dismennorhea | – Dosages above approved maximum |

**Geodon**

| FDA Approved Indications | Off-Label Uses Promoted |
| --- | --- |
| – Schizophrenia | – Depression |
| – Acute manic or mixed episodes associated with bipolar disorder | – Bipolar maintenance |
| – Geodon Intramuscular is indicated for treatment of acute agitation in schizophrenic patients for whom treatment with Geodon is appropriate | – Mood disorder |
| | – Anxiety |
| | – Aggression |
| | – Dementia |
| | – Attention Deficit Hyperactivity Disorder |
| | – Obsessive compulsive disorder |
| | – Autism |
| | – Posttraumatic stress disorder – Unapproved patient populations (including pediatric and adolescent patients) |
| | – Dosages above approved maximum |

**Zyvox**

| FDA Approved Indications | Off-Label Uses Promoted |
|---|---|
| – Vancomycin-Resistant *Enterococcus faecium* infections<br><br>– Nosocomial pneumonia<br><br>– Community-acquired pneumonia<br><br>– Complicated skin and skin structure infections (including diabetic foot infections without concomitant osteomyelitis) | – Infections caused by methicillin-resistant *Staphylococcus aureus* ("MRSA") generally, rather than only those types of MRSA infections for which Zyvox was FDA-approved |

**Lyrica**

| FDA Approved Indications | Off-Label Uses Promoted |
|---|---|
| – Adjunctive therapy for adults with partial onset seizures<br><br>– Management of post-herpetic neuralgia<br><br>– Management of neuropathic pain associated with diabetic peripheral neuropathy<br><br>– Fibromyalgia | – Chronic pain<br><br>– Neuropathic pain<br><br>– Perioperative pain<br><br>– Migraine |

67.    The DOJ Website also states the following regarding the Company's kickback violations:

- Resolves allegations that Pfizer violated the federal False Claims Act by knowingly causing false or fraudulent claims to be submitted to, or causing purchases by, Medicaid, Medicare and other federal health care programs by:

        *        *        *

    - Paying kickbacks to health care providers to induce them to prescribe Bextra, Geodon, Zyvox, and Lyrica;

    - Paying kickbacks to health care providers in connection with its marketing of nine other drugs: Aricept, Celebrex, Lipitor, Norvasc, Relpax, Viagra, Zithromax, Zoloft, and Zyrtec (Kickback Drugs)

- 16 -

68.     The DOJ Website further provides that the Company is now subject to the following

"Administrative Resolution":

**Administrative Resolution**

- Pfizer has entered into a comprehensive five-year Corporate Integrity Agreement with the Office of Inspector General, Department of Health and Human Services

- Requires enhanced accountability, increased transparency, and wide-ranging monitoring activities conducted by both internal and independent external reviewers

    - Also requires:

    - that Audit Committee of Pfizer's Board of Directors annually review the company's compliance program and certify as to its effectiveness;

    - that senior executives annually certify about compliance:

    - that Pfizer notify doctors about the global settlement and establish a mechanism doctors can use to report questionable conduct by any Pfizer representative; and

    - that the company post on its Web site information about payments to doctors, such as honoraria, travel, or lodging

- First Corporate Integrity Agreement to require that a pharmaceutical manufacturer proactively identify potential risks associated with promoting individual products and that it implement a plan to mitigate the identified risks

- If Pfizer fails to comply with its obligations, it risks exclusion from Federal health care programs and monetary penalties

69.     Accordingly, as a result of their actions, defendants have caused Pfizer to incur

significant damages.

70.     On or about March 9, 2005, March 16, 2006, March 15, 2007, March 14, 2008 and

March 13, 2009, Pfizer filed with the SEC its definitive proxy statements for the 2005, 2006, 2007,

2008 and 2009 annual meetings of shareholders, respectively. The 2005, 2006, 2007, 2008 and 2009

proxy statements were approved and authorized by defendants. The 2005, 2006, 2007, 2008 and

2009 proxy statements each omitted material facts which rendered the proxy statements false and misleading when issued. Rather than disclose the true facts complained of herein, the proxy statements concealed defendants' unlawful promotion of prescription drugs such as Bextra, Geodon, Lyrica and Zyvox for unapproved, off-label uses. Disclosure of the true facts would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executives' compensation, and the Company's illicit marketing activities.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

71.     Plaintiffs bring this action derivatively in the right and for the benefit of Pfizer to redress the violation of federal and state law by defendants.

72.     Plaintiffs will adequately and fairly represent the interests of Pfizer and its shareholders in enforcing and prosecuting its rights.

73.     The Board currently consists of the following individuals: defendants Ausiello, Brown, Burns, Burt, Cornwell, Gray, Horner, Kilts, Kindler, Lorch, Mead, Johnson, Sanger and Steere. Plaintiffs have not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act.

74.     First, all of the Board members are interested because they engaged in conduct which is not protected by the business judgment rule in connection with their obvious violations of the Company's Code of Business Conduct and Ethics for Members of the Board of Directors. The Code requires each of the Company's directors to "comply, and oversee compliance by employees, officers and other directors, with laws, rules and regulations applicable to the Company." Further, the Code requires directors to "deal fairly, and . . . oversee fair dealing by employees and officers, with the Company's customers, suppliers, competitors and employees." Each member of the Board permitted individuals at all levels of the Company to engage in the illicit conduct described above, thereby abdicating breaching their fiduciary duties to the Company, and severely damaging the

- 18 -

Company. Therefore, the entire Board faces a substantial likelihood of liability for their breaches of fiduciary duties and any demand upon them is futile.

75.    Second, all defendants were, or should have been aware of numerous red flags regarding the Company's illicit marketing practices. Specifically, this is the fourth time the Company has had to enter into a "corporate integrity" agreement in which it pledged to clean up its drug-marketing practices. Despite being placed on notice of such problems, defendants consciously disregarded their fiduciary duties to Pfizer when, under their direction, the Company continued to expend resources to market its products for "off-label" uses and engage in other illicit marketing activities.

76.    Third, at various points during the Relevant Period, defendants Ausiello, Burns, Burt, Cornwell and Johnson served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are charged with reviewing the Company's compliance with laws, regulations and internal procedures. Defendants Ausiello, Burns, Burt, Cornwell and Johnson breached their fiduciary duties of candor, good faith and loyalty, because the Audit Committee permitted the Company to violate the laws and regulations as discussed above, despite the fact that they were on notice of the Company's illicit marketing activities. Therefore, defendants Ausiello, Burns, Burt, Cornwell and Johnson face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

77.    Fourth, during the Relevant Period, defendants Ausiello, Brown, Burns, Gray and Horner served as members of the Corporate Governance Committee. Pursuant to the Corporate Governance Committee Charter, members of the Corporate Governance Committee are charged with reviewing matters of corporate governance and maintaining an informed status on Company issues related to corporate social responsibility. Defendants Ausiello, Brown, Burns, Gray and Horner

breached their fiduciary duties of candor, good faith and loyalty. The company-wide conduct described above, including fraudulently promoting drugs and paying kickbacks, which ultimately resulted in a $2.3 billion fine, demonstrates that the Corporate Governance Committee failed to ensure that the Company acted in a "socially responsible" manner. Therefore, defendants Ausiello, Brown, Burns, Gray and Horner face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

78.    Fifth, the principal professional occupation of defendant Kindler is his employment with Pfizer as its CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other valuable benefits. Thus, defendant Kindler lacks independence, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

79.    Sixth, by the Board's own admission, defendant Steere lacks independence. Specifically, defendant Steere is the former CEO and Chairman of the Company, pursuant to which he has received substantial monetary compensation and other valuable benefits. Further, defendant Steere is currently the Chairman Emeritus of the Company, pursuant to which he earns director fees of at least $275,000 per year. Thus, in accordance with the Board's own admission, defendant Steere lacks independence, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

## COUNT I

### Against All Defendants for Violations
### of §14(a) of the Exchange Act

80.    Plaintiffs incorporate ¶¶1-79.

81.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, 15 U.S.C. §78n(a), provides that no proxy statement shall contain "any statement which, at the time and in the light of

the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9(a).

82.     Pfizer's proxy statements for at least 2005-2009 violated Exchange Act §14(a) and Rule 14a-9 because they omitted material facts concerning, among other things, defendants' unlawful promotion of certain prescription drugs for unapproved, off-label uses. Defendants knew or were severely reckless in not knowing that the Company's proxy statements were false and misleading when issued.

83.     The proxy statements were an essential link in the accomplishment of the continuation of defendants' unlawful scheme complained of herein. Disclosure of the true facts would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executives' compensation, and the Company's illicit marketing activities.

## COUNT II

### Against All Defendants for Breach of Fiduciary Duties
### for Failing to Properly Oversee and Manage the Company

84.     Plaintiffs incorporate ¶¶1-79.

85.     Defendants owed and owe Pfizer fiduciary obligations of candor, good faith and loyalty. By reason of their fiduciary relationships, defendants specifically owed and owe Pfizer the highest obligation of candor, good faith and loyalty.

86.     Defendants, and each of them, violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry and supervision.

87.     As a direct and proximate result of defendants' failure to perform their fiduciary obligations, Pfizer has sustained significant damages, not only monetarily, but also to its business and goodwill.

88.    As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT III

### Against All Defendants for Unjust Enrichment

89.    Plaintiffs incorporate ¶¶1-79.

90.    By their wrongful acts and omissions, the defendants were unjustly enriched at the expense of and to the detriment of Pfizer.

91.    Plaintiffs, as shareholders and representatives of Pfizer, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT IV

### Against All Defendants for Abuse of Control

92.    Plaintiffs incorporate ¶¶1-79.

93.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Pfizer, for which they are legally responsible.  In particular, defendants abused their positions of authority by causing or allowing Pfizer to engage in the wrongful conduct described above.

94.    As a direct and proximate result of defendants' abuse of control, Pfizer has sustained significant damages.

95.    As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT V

### Against All Defendants for Gross Mismanagement

96.    Plaintiffs incorporate ¶¶1-79.

97.    Defendants had a duty to Pfizer and its shareholders to competently and lawfully manage and control Pfizer's business and affairs.

98.    Defendants, by their actions and by engaging in the wrongdoing described herein, grossly mismanaged the Company's business and affairs, and severely damaged Pfizer's business reputation and goodwill.

## COUNT VI

### Against All Defendants for Waste of Corporate Assets

99.    Plaintiffs incorporate ¶¶1-79.

100.    As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders, defendants have caused Pfizer to incur (and Pfizer may continue to incur) significant legal liability and/or legal costs to defend itself as a result of defendants' unlawful actions.

101.    As a result of this waste of corporate assets, defendants are liable to the Company for damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A.    Against all defendants and in favor of the Company for the amount of damages sustained by the Company as a result of defendants' misconduct;

B.    Directing Pfizer to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before

shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop

and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      C.      Awarding to Pfizer restitution from defendants, and each of them, and ordering

disgorgement of all profits, benefits and other compensation obtained by defendants;

      D.      Awarding to plaintiffs the costs and disbursements of the action, including reasonable

attorneys' fees, accountants' and experts' fees, costs and expenses; and

      E.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED: September 17, 2009           COUGHLIN STOIA GELLER
                               RUDMAN & ROBBINS LLP
                               SAMUEL H. RUDMAN
                               DAVID A. ROSENFELD

                               SAMUEL H. RUDMAN

                               58 South Service Road, Suite 200
                               Melville, NY 11747
                               Telephone: 631/367-7100
                               631/367-1173 (fax)

                               Local Counsel for Plaintiffs

                               RICHARD K. WITCHKO, ESQ.
                               3751 Gibsonia Road
                               Gibsonia, PA 15044
                               Telephone: 724/444-4311

                               Attorneys for Plaintiffs

## VERIFICATION

I, Robert J. Casey, hereby verify that I am familiar with the allegations of the Complaint, and that I have authorized the filing of the Complaint, and the foregoing is true and correct to the best of my knowledge, information and belief.

DATED: ____9 - 11 - 09____      ____Robert J. Casey____

ROBERT J. CASEY

**VERIFICATION**

I, William A. Houston, hereby verify that I am familiar with the allegations of the Complaint,

and that I have authorized the filing of the Complaint, and the foregoing is true and correct to the

best of my knowledge, information and belief.

DATED: _____9 - 10 - 0 9_____    _____

WILLIAM A. HOUSTON